IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

LEE R. BOOTH,                       )
                                    )
            Plaintiff,              )
                                    )
    v.                              )    CASE NO. 2:13-CV-903-WKW
                                    )              [WO]
RANDALL V. HOUSTON,                 )
19th Circuit District Attorney,     )
                                    )
            Defendant.              )

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Lee R. Booth suffered damage to her vocal cords after being on a ventilator for eleven days during an extended hospitalization in August 2009. Upon returning to her job as an assistant district attorney for the 19th Judicial Circuit of Alabama, which she had held since August 2004, Plaintiff contends that her employer discriminated against her based upon her speech disability, retaliated against her for opposing unlawful discrimination, and ultimately constructively discharged her in April 2013, in violation of the Rehabilitation Act of 1973, as amended, 29 U.S.C. §§ 701, *et seq*.  Before the court is Defendant's motion for summary judgment (Doc. # 16), which has been fully briefed (Docs. # 17–18, 20–21, 25).  After careful consideration of the arguments of counsel, the relevant law, and the record as a whole, the court finds that Defendant's motion is due to be granted in part and denied in part.

# I.  JURISDICTION AND VENUE

The court exercises subject-matter jurisdiction pursuant to 28 U.S.C. § 1331. Personal jurisdiction and venue are uncontested.

# II.  STANDARD OF REVIEW

To succeed on summary judgment, the movant must demonstrate "that there is no genuine dispute as to any material fact and [he] is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The court must view the evidence and the inferences from that evidence in the light most favorable to the nonmovant.  *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 820 (11th Cir. 2010).

The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  This responsibility includes identifying the portions of the record illustrating the absence of a genuine dispute of material fact.  *Id.*; Fed. R. Civ. P. 56(c)(1)(A).  Or, the movant can assert, without citing the record, that the nonmoving party "cannot produce admissible evidence to support" a material fact.  Fed. R. Civ. P. 56(c)(1)(B).  If the movant meets its burden, the burden shifts to the nonmoving party to establish – with evidence beyond the pleadings – that a genuine dispute material to each of its claims for relief exists.  *Celotex*, 477 U.S. at 324.  A genuine dispute of material fact exists when the nonmoving party produces evidence allowing a reasonable fact

finder to return a verdict in its favor.  *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001).

## III.  BACKGROUND

### A.    Plaintiff's First Five Years as an Assistant District Attorney

On August 16, 2004, Defendant Randall Houston, district attorney for the 19th Judicial Circuit of Alabama, appointed Plaintiff as a full-time assistant district attorney.   The 19th Judicial Circuit includes Autauga, Chilton, and Elmore counties.   Plaintiff began her employment in the Elmore County division, prosecuting cases in district court and traffic court, but at some point later, she began prosecuting felony cases in circuit court.  (Pl.'s Dep., at 16.)

In September 2008, Plaintiff received a raise, and in April 2009, Defendant promoted Plaintiff to senior assistant district attorney.  For the first five years of her employment, Defendant described Plaintiff as a "loyal and faithful employee" who made "conscientious decisions based on her interpretation of [his] prosecutorial philosophy."  (Def.'s Aff., at 1.)   But Defendant's opinion of Plaintiff's job performance was soon to change.

### B.    Plaintiff's Illness, Vocal Cord Damage, and Return to Work with Accommodations

In August 2009, after five years serving as an assistant district attorney, Plaintiff contracted a sepsis infection, requiring hospitalization.    While

hospitalized, her condition worsened and became critical, and for eleven days, she was on a ventilator and in a medically induced coma. Her condition stabilized, but important to this litigation, the ventilator caused damage to Plaintiff's vocal cords.

Plaintiff returned to work after fifty-two days paid leave. Although Plaintiff was able to speak, her voice had a low volume, which required "amplification in a courtroom." (Pl.'s Dep., at 36.) To help Plaintiff transition back into her position, Defendant assigned an intern to assist Plaintiff with her day-to-day responsibilities. Additionally, a speaker system was installed in the courtrooms to accommodate Plaintiff's lack of vocal volume. Plaintiff agrees that the technology in the Elmore County courtrooms, which included microphones at counsel's table, adequately accommodated her voice impairment. (Pl.'s Dep., at 36–37.)

## C.   **Additional Surgeries and Medical Leave**

Post-dating her return to work in 2009, Plaintiff has undergone nine surgeries to help improve her breathing and voice quality. Her speaking impairment has improved with each reparative surgery (*see* Pl.'s Dep., at 35–36); however, as of April 2014, as indicated in her medical records, Plaintiff continues to have a mildly "low" and "[r]aspy" voice, and her "[v]oice quality [is] abnormal for [her] age and gender." (Apr. 2014 Clinic Notes (Doc. # 21-7, at 4).) Plaintiff's physician notes that, although her voice has improved when "speaking in quiet environments," it "is still very weak" when there is "background noise." Her

4

physician also rendered the following postoperative diagnoses: "chronic hoarseness," "laryngeal insufficiency," "right true vocal fold motion restriction," "posterior commissure web status post reconstruction," and "secondary laryngomalacia from surgical treatment of #4." (Apr. 2014 Clinic Notes.)

It is undisputed that Defendant never denied Plaintiff leave or benefits for her medical absences. (Pl.'s Dep., at 34; *see also* Order on Pretrial H'rg, at 6 (Doc. # 50), in which Plaintiff stipulates that she "was provided with all the leave she requested and was never denied leave.") Plaintiff also says that, when she took leave for additional surgeries, her leave was not "excessive" and that she tried to "make sure that [she] either had something continued" or "that the cases were worked up, and [that she had] talked to people about the cases that [she] had." (Pl.'s Dep., at 31–32.)

## D.  **Plaintiff's Work Performance Issues from Defendant's Perspective**[1]

Within a few months of Plaintiff's return to work in 2009 after her initial hospitalization, James Houts, who at the time was the chief deputy district attorney and Plaintiff's supervisor, complained to Defendant that Plaintiff was not able to "multi-task," was "not supervising effectively," "wasn't doing her work," and "was in and out of the office all the time." (Def.'s Dep., at 73, 74; *see also* Def.'s Aff., at 1.) Mr. Houts recommended that Defendant terminate Plaintiff based on "her

---

[1] Although the summary judgment evidence must be viewed in the light most favorable to Plaintiff, as discussed *infra*, Defendant is required to offer legitimate reasons for taking the adverse employment actions against Plaintiff of which she complains.

inability to do her job effectively and excessive absences from work, which for the most part, were due to post medical events." (Def.'s Aff., at 1.) Defendant did not concur with the recommendation and suggested that Mr. Houts discuss these issues directly with Plaintiff and give her "an opportunity to correct whatever it was he was not happy with." (Def.'s Dep., at 73–74.) Defendant believed that Plaintiff "needed additional time to recover and [that] her inability to multi-task was mostly due to the stress of returning to work after her illness." (Def.'s Aff., at 2.) It is unclear from the record whether Mr. Houts discussed his concerns with Plaintiff. Defendant says, though, that Mr. Houts removed Plaintiff from assisting with scheduling docket events for Elmore County and that he "do[es] not think that [Mr. Houts] mentioned [Plaintiff's performance] to [him] again." (Def.'s Aff., at 2.)

During the same time frame, Beverley Stone, Defendant's chief of staff and director of special services, also began receiving complaints on a weekly basis from employees in the Elmore County office, primarily from support staff and interns. They complained that Plaintiff "was passing off her own work to others to complete," was "frequently leaving the office for unknown reasons," and generally was not available to provide direction to the staff. (Stone's Aff., at 2.) Because these individuals did not want to confront Plaintiff with their concerns and risk "hurt[ing] her feelings," Ms. Stone informed them that "there was nothing [she] could do." (Stone's Aff., at 2.)

At least once, Ms. Stone "casually spoke" with Defendant about some of the "morale problems" she believed that Plaintiff's job performance created in the Elmore County office, but Defendant "instructed [Ms. Stone] to try to get everyone to work with [Plaintiff] until she got back to 100%." (Stone's Aff., at 3.) Ms. Stone had at least one meeting with Plaintiff in late 2009 or early 2010 to address concerns that her leave resulting from the combination of her and her family members' medical appointments was excessive. Plaintiff "became very aggressive" when Ms. Stone suggested that Plaintiff try to find other family members or friends to help cover some of her family appointments. (Stone's Aff., at 3.)

Notwithstanding the complaints about Plaintiff's job performance, and Defendant's concerns about Plaintiff's steady decline in work performance, in March 2011, Defendant awarded a discretionary merit-based pay raise exclusively to Plaintiff, and a month later, Plaintiff received an additional two-percent, across-the-board raise. (Def.'s Dep., at 48–50.) When Plaintiff thanked Defendant by email for the merit raise, he replied, "You deserve it, wish it could be much more." (Mar. 23, 2011 email (Pl.'s Ex. 6).)

## E.   Plaintiff's Transfer to the Chilton County Office

Plaintiff worked in the Elmore County office through January 2012. At that time, Defendant moved Plaintiff to the Chilton County office and reassigned

Assistant District Attorney CJ Robinson from Chilton County to Elmore County.[2]

Plaintiff was one of two attorneys assigned to the Chilton County office; she retained her position as a senior assistant district attorney and had supervisory authority over Assistant District Attorney Brandon Bates. Defendant was hopeful that Plaintiff's supervisory abilities would improve if he moved her to the Chilton County office "where there is less work, less case load, . . . [and] different people." (Def.'s Dep., at 121–22.) In his affidavit, Defendant explains that "the stress level for [Plaintiff] would be much less in Chilton County," in part, because "Chilton County only has Grand Jury twice a year and the number of felony cases in Chilton County is substantially less than in Elmore or Autauga." (Def.'s Aff., at 4–5.) He further says:

> I also believed this would give [Plaintiff] the opportunity to run an office on her own without me there to interfere with her supervisory style. I told [Plaintiff], when I reassigned her to Chilton County, that I expected her to take control of the situation and run the office like she knew I expected it to be run. When I moved Robinson to Elmore County[,] I also made him [Plaintiff's] . . . supervisor; however, he did not hold the title of Chief Deputy until several months later.

(Def.'s Aff., at 4–5.)

Plaintiff recalls that, after the fact, Defendant's Chief Investigator Ray Puckett told her that Defendant transferred her to Chilton County because Mr. Robinson and Mr. Bates "didn't get along" and that Defendant believed that, based

---

[2] Mr. Robinson's reassignment was in anticipation of his promotion to chief deputy upon Mr. Hout's departure from the office. (Def.'s Aff., at 4.)

upon her experience and age, Mr. Bates "may respect" her more than he respected Mr. Robinson.  (Pl.'s Dep., at 42.)   Later, Plaintiff also learned that Defendant transferred her to Chilton County because the work was "easier."  (Pl.'s Dep., at 43.)   Plaintiff felt, though, that the work was not easier in Chilton County because "[t]here was a lot more courtroom work" in district court and traffic court, and there were only two assistant district attorneys assigned to that office.  (Pl.'s Dep., at 43.)

## F.   Microphone Accommodations in the Chilton County Courtrooms

At the time of Plaintiff's reassignment to Chilton County, the courtrooms in that county did not have any type of sound system.  (Pl.'s Dep., at 37; Def.'s Aff., at 5.)  At Plaintiff's request, Defendant purchased Plaintiff a portable amplification system that included a microphone for her use in the courtroom in Chilton County. Plaintiff has conceded that Defendant provided the "accommodation [she] needed."  (Pl.'s Dep., at 39–40, 45, 53.)

## G.   Plaintiff's Work Performance in Chilton County

Between January 2012 and May 2012, Mr. Robinson, at Defendant's request, monitored Plaintiff's performance in the Chilton County office.   Mr. Robinson describes in detail myriad problems he observed.  He attests that, during her first grand jury in Chilton County, where the docket consisted of approximately 300 cases, Plaintiff was "disruptive and ill prepared to present cases from multiple

officers and seemed ill equipped to steer the questions asked by grand jurors." (Robinson's Aff., at 2.)   In his affidavit, Mr. Robinson does not indicate if he discussed with Plaintiff his concerns about her grand jury conduct.

Mr. Robinson also believes that Plaintiff repeatedly acted in a manner that suggested problems with her memory.   According to Mr. Robinson, Plaintiff negotiated a plea agreement with terms that were contrary to multiple discussions he had had with her concerning proper handling of that particular case.   She also either "disregard[ed]" office policy or forgot the policy when, in a different case, she negotiated a plea agreement that inappropriately included the defendant's waiver of potential civil claims.   (Robinson's Aff., at 4.)   Mr. Robinson further believes that Plaintiff forgot the policy requiring the physical presence of an attorney at all times in the office because "on more than one occasion," she left the Chilton County office without an attorney present.   (Robinson's Aff., at 3.)   These and other alleged deficiencies were the catalyst behind the convening of a meeting in May 2012.

## H.   **The May 2012 Meeting**

The May 2012 meeting, which Plaintiff secretly recorded, was held at the Elmore County office.   Present for the meeting were Plaintiff, Ms. Stone, Mr. Puckett, and Mr. Robinson.   The meeting occurred at Defendant's direction. (Def.'s Dep., at 116–17; Robinson's Aff., at 4.)

As the first order of business at the meeting, Plaintiff was "taken off" one capital murder case, not assigned to another, and given a limited role in a third capital murder case. Mr. Robinson says that Plaintiff was told only that these prosecutorial assignments were for "logistical reasons," which Mr. Robinson says was "true," but that Plaintiff's lack of "memory recall" also was an undisclosed "motivating factor." (Robinson's Aff., at 4.)

Ms. Stone then expressed "concerns" with Plaintiff's alleged "lapses in memory," which Ms. Stone categorized as the "only issue" impeding Plaintiff's job performance. Ms. Stone gave some illustrations of what she said demonstrated a "pattern" of memory loss that had developed since Plaintiff's hospitalization in August 2009, including: (1) Plaintiff's apparent failure to remember Defendant's directive that Plaintiff have no involvement in the criminal cases her husband, a police officer, had investigated; (2) Plaintiff's inability to recall a conversation with an investigator about rescheduling a case due to the impending birth of his child; and (3) Plaintiff's request to participate in a capital murder trial when in fact she previously had negotiated a plea agreement that had been accepted by the court. Ms. Stone explained that these and other incidents "as a whole" gave her a "real" concern "about [Plaintiff's] memory loss" in both administrative and substantive matters. The conversation then turned to Plaintiff's voice after Plaintiff asked several times, "What else is there?" (May 2012 Meeting (audio

recording) (Ex. 3 to Doc. # 21); *see also* Robinson's Aff., at 5 ("We relayed to Ms. Booth that her voice was an issue, but that was not the purpose of the [May 2012] meeting.").)

Ms. Stone said, "[I]f you cannot remember, if you cannot speak where people can understand you on the phone and we've had two complaints . . . about the fact that 'I can't talk to her, I cannot understand her.'  A lawyer is an actor; [she] ha[s] to talk and [she] ha[s] to remember . . . ."  (May 2012 Meeting (audio recording).)  During that conversation, Ms. Stone also said, "It's about your health, which is your memory and your voice."  Ms. Stone told Plaintiff that she was not being terminated, but that "there [were] some problems" that "ha[d] to be fixed." Plaintiff responded that she was not certain what else she could do "about her voice."  Ms. Stone reiterated that "[a] lawyer has to have a voice to work," and that, if Plaintiff felt that there was nothing she could do, then she "should check into some type of disability."  Ms. Stone then relayed to Plaintiff her belief that Plaintiff was "unable to do the job that [Defendant] hired [her] to do ten years ago."  The meeting concluded with Ms. Stone stating, "[Y]ou are not willing to try to work with us, alleviate any of our concerns, or even accept the fact that there might be a problem."  (May 2012 Meeting (audio recording).)  Plaintiff describes Ms. Stone's overall tone as "screaming."  (Pl.'s Dep., at 49.)

After the May 2012 meeting, Ms. Stone and Mr. Robinson recommended Plaintiff's termination to Defendant.  Defendant refused and said he wanted to give Plaintiff time to "get through this."  (Def.'s Dep., at 117.)

## I.      **Plaintiff's Post-May 2012 Job Performance**

Mr. Robinson attests that, after the May 2012 meeting, Plaintiff's performance problems continued.  It was in January 2013, however, that Mr. Robinson says he witnessed "a level of incompetence leading up to th[e January 2013] grand jury that," in his opinion, "[was] unequaled . . . by any attorney" with whom he has worked.  (Robinson's Aff., at 9.)  He explains that Plaintiff

> neglected her duties, failed to meet communicated deadlines, submitted inadequate and incomplete files, and passed-off responsibilities (many of which only attorneys are qualified to make and she passed them off onto support staff and interns), and then failed to correct the problems when she was sent home from the winter conference.

(Robinson's Aff., at 9.)  The grand jury coordinator, Micke Arant Evans, had to step in and attempt to rectify these shortcomings.  (Evans's Aff., at 1.)

## J.      **The January 30, 2013 Meeting**

On January 30, 2013, Mr. Robinson, accompanied by Mr. Puckett, met with Plaintiff and explained to her that "her reassignment to Chilton County was not working out the way [they] hoped it would."  (Robinson's Aff., at 10.)  He did not "cover the same issues" that were covered in the May 2012 meeting.  He did bring up her voice, though, because he "had received additional complains about

13

[Plaintiff's] voice from judges, court staff, attorneys, and victims." In his affidavit, Mr. Robinson paraphrases:  "Despite the usage of a microphone and amplifier[, Plaintiff] was difficult to hear and even more difficult to understand." (Robinson's Aff., at 10.)  The audio recording of the January 30, 2013 meeting, which Plaintiff again surreptitiously recorded, reveals to the extent audible, the specifics of Mr. Robinson's statements to Plaintiff:

> It's just not working out very well with you in Clanton.  Now, there have been some stuff that has been little and there's been some stuff that is bigger stuff.  Even some of the judges right now have concerns about your voice and some other things in court.  I know everybody was hopeful that it was going to get better and continue to get better. Right now even some of the judges, they have major concerns and don't feel like [inaudible].  A big part of what we do is in the courtroom.  I mean you've been doing this for a long time; I know you know all that.  Also, the problems with some of the people, and I'm not just talking about the stuff last week with Micke [the Grand Jury Coordinator].  Obviously, . . . you and Micke have had longstanding problems that none of us are going to fix . . . [,] not just that . . . . other things with people in the office . . . .

(Jan. 30, 2013 meeting (audio recording) (Ex. 4 to Doc. # 21).)  Mr. Robinson further explains that "[t]he weakness of her voice remained unchanged for the last couple years, but the deterioration of her ability to competently execute even the most basic duties [for which] she was responsible was the catalyst for the meeting on January 30, 2013."  (Robinson's Aff., at 11.)

At this meeting, Mr. Robinson, at Defendant's directive, gave Plaintiff two alternative employment options.  The first option was that she could work part-

time in juvenile court at approximately half her pay with benefits until her retirement in the state system vested (approximately eighteen or nineteen months). The second option was that she could "work whenever [she was] needed . . . and have more hours with a little more pay." (Pl.'s Dep., at 53–54.) The second option, which also was considered part-time, would include no benefits for the purpose of permitting Plaintiff, if she desired, to obtain additional employment outside the state system. (Pl.'s Dep., at 54–55.) Neither option included supervisory responsibilities, and Plaintiff says that, under either option, it "was [her] understanding that [her] job would end after retirement vested."[3] (Pl.'s Dep., at 53.)

Plaintiff rejected both options because she was "absolutely humiliated" that Defendant, for whom she had worked for ten years, "didn't give [her] the courtesy of presenting those options . . . to [her] himself." (Pl.'s Dep., at 57.) She also was "devastated [and] embarrassed." (Pl.'s Dep., at 59.) Plaintiff's lifelong dream was to be a "career prosecutor" and a reassignment to "juvenile court [would have been] just a complete humiliation" when for the past decade she had "prosecute[d] felony cases" and "had had a very good track record." (Pl.'s Dep., at 57.)

---

[3] Defendant's testimony differs as to the nature of the two options. Defendant says that the first option was for full-time employment with a reduced salary until Plaintiff vested in the state retirement system and that, under the second option, Plaintiff could have worked in the part-time position "for as long as she wanted." (Def.'s Dep., at 111–13; *see also* Robinson's Aff., at 11 (same).) At the summary-judgment phase, Plaintiff's account, which finds support in the January 2013 audio recording, is presumed true.

About an hour after the meeting, Plaintiff texted Mr. Robinson proposing a third option.   She asked Mr. Robinson "if she could clean out her office immediately and remain on the payroll until the end of March" 2013.  (Robinson's Aff., at 11.)  Defendant accepted Plaintiff's proposal, and Plaintiff's employment ended on April 1, 2013.

**K.   This Lawsuit**

In December 2013, Plaintiff filed this lawsuit.   Liberally construed, the Complaint contains the following claims in violation of the Rehabilitation Act: (1) denial  of  a  reasonable  accommodation;  (2) constructive  discharge;  (3) disability-based  hostile  work  environment;  (4) retaliation;  and  (5) retaliatory hostile work environment.

**L.   Defendant's Summary Judgment Affidavit**

Defendant has moved for summary judgment on all claims.   In his affidavit submitted in support of the pending summary judgment motion, he says that he "would never have allowed for [Plaintiff] to be terminated simply because of her vocal issues." (Def.'s Aff., at 6.)  Defendant offers numerous reasons unrelated to her voice for his decision in January 2013 to relieve Plaintiff of her supervisory responsibilities and demote her to part-time status.  He provides a detailed list of what he contends were Plaintiff's myriad post-August 2009 job deficiencies, including the following:  (1) a conflict Plaintiff had with a case agent concerning

her handling of the case; (2) Plaintiff's apparent memory loss about Defendant's long-time policy on prosecuting "one pill" felony cases[4]; (3) instances where Plaintiff allowed her husband, a police officer, to sleep in her office on days when he was the investigator on cases being presented to the grand jury; (4) Plaintiff's improper participation in her husband's presentation of cases to the grand jury; (5) Plaintiff's unexpected absences to deal with "personal issues with family"; (6) the fact that Plaintiff brought her child to the office for extended periods of time and occasionally had him hide under her desk; (7) her poor decision-making (such as allowing her husband, a police officer, to attend a crime scene on a case worked by another agency); (8) her violation of policy forbidding an assistant district attorney from offering a criminal settlement that included the settlement of a condemnation case; (9) allowing an intern to cover the office without attorney supervision; (10) her failure to attend planned meetings with victims and law enforcement officers; and (11) her failure to prepare grand jury files adequately. (*See* Def.'s Aff., at 2–8.)

Defendant says that some of these deficiencies suggested a 2009 post-hospitalization loss of memory and that other of Plaintiff's "memory issues" are

---

[4] As explained by Defendant, a "one pill" felony case is a case where "the primary felony charge is based on the possession of a single pill constituting a felony possession of controlled substance charge" and the remaining counts are non-felony charges.  Defendant says that in a "one pill" case, "it is the general policy of th[e] office not to indict it as a felony and remand the case back to district court for prosecution on the misdemeanor counts and recharge the felony as something else."  (Def.'s Aff., at 2.)

"covered by affidavits from the individual employees" who had personal knowledge of those occurrences.  (Def.'s Aff., at 2.)  These affidavits total nine, and Plaintiff emphasizes that the affidavits are the culmination of Mr. Robinson's post-litigation email to staff dated July 8, 2014, requesting "summaries of individual dealings with" Plaintiff.  (Def.'s Resp. to Pl.'s 2d Request for Prod., at 2 (Doc # 21-5).)

Defendant did not document Plaintiff's performance issues in her personnel file or otherwise create a contemporaneous written record of the issues, and he did not have a progressive discipline policy.  Defendant also did not have a policy requiring performance evaluations, and presumably for that reason, there are no written performance evaluations of Plaintiff in the summary judgment record. (Def.'s Dep., at 22, 32, 37, 126.)

## IV.  DISCUSSION

As grounds for summary judgment, Defendant contends that under the burden-shifting framework in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), Plaintiff's claims cannot survive summary judgment.  He contends that Plaintiff cannot establish a prima facie case of discrimination or retaliation and that, even if Plaintiff could establish a prima facie case, she fails to rebut Defendant's legitimate, nondiscriminatory and non-retaliatory reasons for his actions.  More specifically, Defendant argues that he undisputedly fulfilled

18

Plaintiff's requests for amplification technology in the courtrooms, that Plaintiff cannot show that he subjected her to an adverse employment action or that she engaged in protected activity, and that Plaintiff fails to demonstrate severe or pervasive harassment to support her claims for hostile work environment under the Rehabilitation Act's anti-discrimination and anti-retaliation provisions.   Plaintiff opposes summary judgment.

The claims are addressed in the following order:   (1) disability discrimination alleging the denial of a reasonable accommodation; (2) disability discrimination alleging constructive discharge; (3) retaliation; and (4) hostile work environment (disability- and retaliatory-based).   For the reasons that follow, the disability discrimination claim alleging constructive discharge survives summary judgment, but the remaining claims do not.

## A.   Disability Discrimination Under the Rehabilitation Act

Section 504 of the Rehabilitation Act, codified at 29 U.S.C. § 794, provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, . . . be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ."[5]

---

[5] "[C]ases involving the ADA [Americans with Disabilities Act] are precedent for those involving the Rehabilitation Act."  *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005).  The ADA and Rehabilitation Act are not identical, however.  One difference important to this case lies in the causation standard. The Rehabilitation Act requires that the discrimination occur "solely by reason of her or his disability." § 794(a).  In contrast, the ADA's "prohibition of discrimination . . . 'by reason of' disability establishes a motivating factor causal standard for

§ 794(a).  The Rehabilitation Act permits more than one type of claim for proving disability discrimination.  Three types of claims are relevant here:  (1) denial of a reasonable accommodation; (2) adverse employment action; and (3) hostile work environment.   The first claim is where the employee contends that he or she is a qualified individual who, "with reasonable accommodation, can perform the essential functions of the position in question."  *Barth v. Gelb*, 2 F.3d 1180, 1186 (D.C. Cir. 1993) (citation and internal quotation marks omitted).  In these cases, the employer "will usually contend that no reasonable accommodation is available."  *Id.*  The second claim is when an employee contends that he or she suffered an adverse employment action solely because of his or her disability, and the employer defends the action on grounds that it took an adverse employment action against the employee for reasons that are not related to the individual's disability.  *See id*.  The third claim is where the employee alleges that he or she was subjected to a hostile work environment.  *See Burgos v. Chertoff*, 274 F.

---

liability when there are two or more possible reasons for the challenged decision and at least one of them may be legitimate."  *K.M. ex rel. Bright v. Tustin Unified Sch. Dist.*, 725 F.3d 1088, 1099 (9th Cir. 2013) (citation and internal quotation marks omitted); *see also Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1212 n.6 (11th Cir. 2008) (noting that "plaintiffs claiming intentional discrimination under the RA [Rehabilitation Act] must show that they were discriminated against '*solely* by reason of [their] disability,' but the ADA requires only the lesser 'but for' standard of causation" (internal citation omitted)).

Contrary to the sole-causation standard under the Rehabilitation Act, Plaintiff's Complaint and summary judgment brief erroneously presume that Plaintiff can prevail at trial if her disability was "a substantial and/or motivating factor" in Defendant's alleged adverse treatment of her.  (*See* Pl.'s Summ. J. Resp., at 14; *see* Compl., at 11.)  Plaintiff is forewarned that such proof at trial will not suffice to establish a violation of the Rehabilitation Act.

App'x 839, 842 (11th Cir. 2008) (analyzing a hostile-work-environment theory under the Rehabilitation Act).

### 1. *Reasonable Accommodation*

As to the first claim, in her summary judgment response, Plaintiff says that she "is not claiming at summary judgment that she was not provided her required accommodation of a microphone." (Pl.'s Summ. J. Resp., at 1–2 (Doc. # 20).) Plaintiff's statement comports with the evidence. Namely, at her deposition, Plaintiff conceded that the only accommodation she requested was amplification equipment in the courtrooms and that Defendant provided the requested accommodation. (*See* Pl.'s Dep., at 39–40, 45, 53.) It appears, though, that Plaintiff is attempting to forego reliance on her reasonable accommodation claim *only for purposes of summary judgment*. To the extent that Plaintiff intends to resurrect this claim at trial, she cannot do so for the following reason.

Defendant has moved for summary judgment on the reasonable accommodation claim, relying primarily on Plaintiff's deposition testimony, and has met his burden of showing that "there is no genuine dispute as to any material fact" and that he "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). By failing to submit evidence that raises a genuine dispute of material fact for trial, Plaintiff's claim fails at the summary-judgment phase. The claim cannot be raised

anew at trial, and summary judgment is due be entered in Defendant's favor on this claim.

**2.    *Adverse Action (Constructive Discharge)***

Plaintiff's allegation that Defendant "forc[ed] her to resign" (Compl. ¶ 66(e)) will be analyzed as a constructive discharge claim. Plaintiff can prove this claim through circumstantial or direct evidence of discrimination. *See Curry v. Sec'y, Dep't of Veterans Affairs*, 518 F. App'x 957, 963 (11th Cir. 2013) (a case decided under the Rehabilitation Act). Where there is no direct evidence of discrimination in an action brought under the Rehabilitation Act, the Eleventh Circuit has used the burden-shifting framework set out in *McDonnell Douglas*, 411 U.S. at 792. *See Curry*, 518 F. App'x at 963; *Nadler v. Harvey*, No. 06-12692, 2007 WL 2404705, at *4 (11th Cir. Aug. 24, 2007); *Boone v. Rumsfeld*, 172 F. App'x 268, 270 (11th Cir. 2006) ("Discrimination claims brought under the Rehabilitation Act . . . are analyzed under the three-part test outlined in *McDonnell Douglas*.").[6]

Under this paradigm, the plaintiff must first make out a prima facie case of discrimination. If the plaintiff succeeds, "the burden shifts to the defendant to articulate a legitimate nondiscriminatory reason for its actions." *Chapter 7 Trustee*

---

[6] While the cited decisions are unpublished, there are ample published opinions of the Eleventh Circuit permitting plaintiffs to prove disability discrimination under the ADA "through circumstantial evidence using the familiar burden-shifting analysis employed in Title VII employment discrimination cases." *Wascura v. City of South Miami*, 257 F.3d 1238, 1242 (11th Cir. 2001).

*v. Gate Gourmet*, 683 F.3d 1249, 1255 (11th Cir. 2012).  If the defendant proffers a nondiscriminatory reason, the burden returns to the plaintiff, who must show that the proffered reason is a ruse for the real, discriminatory reason.  *Id.*  "It is at this stage that the plaintiff's 'burden . . . merges with the ultimate burden of persuading the court that [the plaintiff] has been the victim of intentional discrimination.'"  *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1326 (11th Cir. 2011) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)).  "[I]f a jury reasonably could infer from the evidence presented that the employer's legitimate justification is pretextual, the question becomes whether the evidence, considered in the light most favorable to the plaintiff, yields the reasonable inference that the employer engaged in the alleged discrimination."  *Id.*

"Provided that the proffered reason is one that might motivate a reasonable employer, [the employee] must meet that reason head on and rebut it."  *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000).  The employee does not rebut the reason "by simply quarreling with the wisdom of that reason," *id.*, but by exposing "weaknesses, implausibilities, inconsistencies, incoherencies[,] or contradictions" in the employer's reasoning.  *Springer v. Convergys Customer Mgmt. Grp. Inc.*, 509 F.3d 1344, 1348 (11th Cir. 2007) (citation and internal quotation marks omitted); *see also Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1279 (11th Cir. 2008) (To show pretext, the employee must "demonstrate

weaknesses or implausibilities in the proffered legitimate reason so as to permit a rational jury to conclude that the explanation given was not the real reason, or that the reason stated was insufficient to warrant the adverse action."). "A reason is not pretext for discrimination," however, "'unless it is shown both that the reason was false, and that discrimination was the real reason.'" *Brooks v. Cnty. Comm'n of Jefferson Cnty., Ala.*, 446 F.3d 1160, 1163 (11th Cir. 2006) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)).

Both parties proceed under the circumstantial evidence framework. The court will do the same.

### (a)   *Prima Facie Case*

For purposes of the prima facie case of the *McDonnell Douglas* analysis, Plaintiff can make out a § 504 disability discrimination claim by showing that (1) she has a disability, (2) she was otherwise qualified for her job as an assistant district attorney, (3) she was subjected to an adverse employment action, and (4) the adverse employment action occurred under circumstances that raise a reasonable inference of unlawful discrimination solely on the basis of Plaintiff's disability. *See Ward v. United Parcel Serv.*, ___ F. App'x ___, 2014 WL 4452960, at *4 (11th Cir. 2014) ("To establish a prima facie case [under the Americans with Disabilities Act], a plaintiff may show that (1) he was disabled, (2) he was qualified to perform the job, and (3) he was subjected to an adverse employment

action because of his disability." (citing *Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1193 (11th Cir. 2004)); *Tarmas v. Sec'y of Navy*, 433 F. App'x 754, 761–62 (11th Cir. 2011) (holding that under the Rehabilitation Act to establish a prima facie case under the *McDonnell Douglas* framework, "[i]t is not enough for a plaintiff to demonstrate that an adverse employment action was based partly on his disability," but instead, "a plaintiff must prove that he suffered an adverse employment action 'solely by reason of' his handicap").[7]   Defendant challenges all four elements.[8]

### (i)   Whether Plaintiff Has a Disability

The Rehabilitation Act incorporates the Americans with Disabilities Act's ("ADA") definition of a "disability."   *See* 29 U.S.C. § 705(9)(B) (providing that

---

[7]   The term "prima facie" has two meanings.   *See Collado v. United Parcel Serv., Co.*, 419 F.3d 1143, 1153 n.7 (11th Cir. 2005) (noting that a "source of confusion stems from the fact that the term 'prima facie case' has two meanings" and explaining how "prima facie" is used in an ADA discrimination case).   "Prima facie" traditionally refers to the "'quantum of evidence needed to create a jury question.'"   *Id.* (quoting *Wright v. Southland Corp.*, 187 F.3d 1287, 1292 (11th Cir. 1999)).   "In the *McDonnell Douglas* context, however, the term relates to a step in the analytical framework."   *Id.*   Here, the term "prima facie" is used to describe the first step of the *McDonnell Douglas* framework and is not used in the traditional sense as the "'quantum of evidence needed to create a jury question.'"   *Collado*, 419 F.3d at 1153 n.3 (quoting *Wright*, 187 F.3d at 1292).

The parties rely on *Jackson v. Veterans Administration*, 22 F.3d 277, 278 (11th Cir. 1994).   (*See, e.g.*, Def.'s Summ. J. Br., at 9.)   *Jackson*, which was an appeal after a bench trial, recites the prima facie elements in the traditional sense, not as part of the *McDonnell Douglas* framework.   But admittedly, as touched on later in this opinion, it is difficult to discern how the two prima facie standards differ in this circuit.

[8]   Under the Rehabilitation Act, to establish a prima facie case, the employee also must show that he or she "worked for a program or activity that received federal financial assistance."   *Jackson*, 22 F.3d at 278.   Defendant does not dispute that his agency receives federal financial assistance.   (*See* Order on Pretrial H'rg, at 6 (Stipulations).)

the term "disability" for purposes of § 794 has "the meaning given it in" 42 U.S.C. § 12102. Under the ADA, "disability" means "with respect to an individual – (A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment."  42 U.S.C. § 12102(1); *see generally Cash v. Smith*, 231 F.3d 1301, 1305 (11th Cir. 2000) (discussing the definition of a disability in the context of the Rehabilitation Act).  "[M]ajor life activities include . . . speaking." § 12102(2)(A).

In 2008, "Congress made significant changes to the ADA by enacting the ADA Amendments Act of 2008 (the 'ADAAA'), which became effective on January 1, 2009," *Mazzeo v. Color Resolutions Int'l, LLC,* 746 F.3d 1264, 1267 (11th Cir. 2014), and prior to the initial injury to Plaintiff's vocal cords.  "Through the ADAAA, Congress broadened the definition of 'disability,' thereby broadening that term's coverage, so that the definition of disability under the ADA would be interpreted consistently with how courts had applied the definition of a handicapped individual under the Rehabilitation Act of 1973."[9]  *Borwick v. Univ. of Denver*, 569 F. App'x 602, 604 (10th Cir. 2014) (internal citations and quotation marks omitted); *see also* Pub. L. No: 110–325, 122 Stat. 3553 § 2(a) (3) ("[W]hile Congress expected that the definition of disability under the ADA would be

---

[9] The Rehabilitation Act, which was passed in 1973, used the term "handicap," not "disability." The 1992 amendments to § 794(a) substituted "disability" in place of "handicap."

interpreted consistently with how courts had applied the definition of a handicapped individual under the Rehabilitation Act of 1973, that expectation has not been fulfilled.").   In his arguments, Defendant has not acknowledged the ADAAA; however, given its stated purpose to expand the ADA's coverage so as to align with that afforded under the Rehabilitation Act, the court finds that the ADAAA and its interpretative regulations are persuasive authority for defining "disability" for purposes of Plaintiff's Rehabilitation Act discrimination claim.

The ADAAA provides that the "definition of disability . . . shall be construed in favor of broad coverage."   § 12102(4)(A).   Additionally, the interpretive regulations set out that "the threshold issue of whether an impairment 'substantially limits' a major life activity should not demand extensive analysis." 29 C.F.R. § 1630.2(j)(1)(iii).   Instead, "'the primary object of attention in cases brought under the ADA should be whether entities covered by the ADA have complied with their obligations[.]'"   *Mazzeo*, 746 F.3d at 1268 (quoting 42 U.S.C. § 12101 note).

The determination of whether "an individual is substantially limited in a major life activity" encompasses a "condition, manner, or duration" analysis:

> [I]n determining whether an individual is substantially limited in a major life activity, it may be useful in appropriate cases to consider, as compared to most people in the general population, the condition under which the individual performs the major life activity; the manner in which the individual performs the major life activity; and/or the duration of time it takes the individual to perform the major

life activity, or for which the individual can perform the major life activity.

*Id.* § 1630.2(j)(4)(i).

Plaintiff contends that, because of the damage to her vocal cords caused by the ventilator, she is substantially limited in the major life activity of speaking. *See* § 12102(1)(A). To summarize, under subsection (A), an individual has a qualifying disability if he or she has (1) an impairment (2) that affects a major life activity and (3) substantially limits that major life activity. Defendant does not challenge that Plaintiff has a physical impairment that affects the major life activity of speaking. Accordingly, this portion of the definition of a disability is deemed satisfied.

Rather, Defendant argues that Plaintiff's impairment does not pose a substantial limitation on her ability to speak. Defendant categorizes Plaintiff's asserted disability as a temporary condition, analogous to a spasm in a back muscle or an operable knee injury, and argues that a temporary impairment does not qualify as one that is substantially limiting. Defendant focuses on Plaintiff's testimony that her speaking ability has continued to improve as a result of the nine surgeries she has undergone over the course of nearly five years and on her admission that, during her employment, several judges could hear her in the courtroom without the aid of the amplification system.

28

To survive summary judgment, Plaintiff must produce evidence from which a reasonable jury could find that her vocal cord damage substantially limited her ability to speak.  For the reasons that follow, she meets this threshold in light of the ADAAA's broad construction of the phrase "substantially limits."

First, Plaintiff has presented medical evidence, although she is not required to do so, *see* § 1630.2(j)(1)(v), that the ventilator caused damage to her vocal cords in August 2009, and that she remains under a doctor's care for treatment of her persistent vocal cord injury.  (*See* Pl.'s Medical Records (Ex. 7 to Doc. # 21).) Plaintiff further has testified that she has undergone nine surgeries over the course of her treatment, and her medical records reflect that, as of April 2014 (almost five years after the initial injury), (1) she still has multiple postoperative diagnoses including "laryngeal insufficiency" and "chronic hoarseness," (2) her voice remains "low," "[r]aspy, and "still very weak" when there is "background noise," and (3) her "[v]oice quality [is] abnormal for patient's age and gender."  (Apr. 2014 Clinic Notes.)  The medical records indicate that for more than five years, Plaintiff's voice has been affected detrimentally by the damage to her vocal cords caused by the ventilator, and a reasonable jury could find that nine surgeries later, Plaintiff's voice still is not of the same volume or quality as that of the average person in the general population.  *See* § 1630.2(j)(4)(i).

29

Second, although Defendant focuses on Plaintiff's testimony that at times the judges could understand Plaintiff in the courtroom when her microphone was turned off, there is conflicting evidence.   Prior to her alleged constructive discharge, both Mr. Robinson and Ms. Stone told Plaintiff that her voice "was an issue," and Mr. Robinson told Plaintiff that some judges had a problem with her voice in the courtroom.  (Jan. 30, 2013 meeting (audio recording).)  Defendant also admits that Plaintiff's voice posed "some degree of inconvenience" in that "[it] was at times difficult to hear her."  (Def.'s Aff., at 5.)  Overall, the evidence creates a genuine dispute for trial as to whether Plaintiff's speech was difficult to understand, particularly in the courtroom.

Third, there is evidence that contradicts Defendant's argument that Plaintiff has suffered only a temporary impairment to her speaking ability.  The evidentiary record tracks Plaintiff's nearly five-year struggle with her voice difficulties. Although her voice quality has improved, the most recent clinical notes, as discussed, indicate that her voice remains impaired.  Moreover, Defendant's focus on a temporal requirement loses efficacy in light of the ADAAA.  Defendant relies on pre-ADAAA case law to argue that temporary impairments do not qualify as disabilities, but the ADAAA recognizes that "transitory and minor" impairments may constitute disabilities.  *See* § 1630.2(j)(1)(ix) ("[T]he six-month 'transitory' part of the 'transitory and minor' exception to 'regarded as' coverage . . . does not

apply to the definition of 'disability' under . . . the 'actual disability' prong."). The revised regulations interpreting the ADAAA also do not define "duration" in terms of the permanency of the impairment and, thus, call into question the continuing validity of pre-ADAAA case law focusing on the long-term effects of the impairment. *See Moore v. Jackson Cnty. Bd. of Educ.*, 979 F. Supp. 2d 1251, 1261 (N.D. Ala. 2013) (concluding that by enacting the ADAAA, "Congress no longer intends for temporary impairments to be excluded from the definition of 'disability'"); *see also* § 1630.2(j)(4)(i) (defining "duration" not in terms of permanency of disability but in terms of the "duration of time it takes the individual to perform the major life activity, or for which the individual can perform the major life activity"). For these reasons, Defendant's temporal arguments against a finding of a substantially limiting impairment are rejected.

In sum, the evidence creates a genuine dispute of material fact whether Plaintiff's voice is impaired to the extent that it substantially limits her ability to speak. Accordingly, whether Plaintiff is an individual with a qualifying disability is for the jury to decide.[10]

### (ii)  *Whether Plaintiff Is a Qualified Individual*

"The term 'qualified individual' means an individual who, with or without reasonable accommodation, can perform the essential functions of the employment

---

[10] In light of this finding, it is unnecessary to address Plaintiff's alternative argument that she is disabled because Defendant regarded her as having a speaking impairment.

position that such individual holds or desires." 42 U.S.C. § 12111(8). The Eleventh Circuit has held that the inquiry of whether an individual is "qualified" for a job entails a two-step process. First, the individual must demonstrate "sufficient experience and skills, an adequate educational background, or the appropriate licenses for the job . . . ." *Gary v. Ga. Dep't of Human Res.*, 206 F. App'x 849, 851–52 (11th Cir. 2006) (quoting *Reed v. Heil Co.*, 206 F.3d 1055, 1062 (11th Cir. 2000)). Second, the individual must show that he or she can perform the essential functions of the job, either with or without reasonable accommodations. *See id.*

Defendant does not dispute that Plaintiff's educational degrees, skills, and experience made Plaintiff a qualified assistant district attorney when he appointed her in 2004. He also confirms that Plaintiff performed her work satisfactorily as an assistant district attorney for the nearly five years preceding her hospitalization in August 2009. Defendant contends, however, that, after Plaintiff's return to work in 2009, her performance began to suffer and steadily deteriorated to the point that she no longer satisfied the minimum job requirements. Specifically, Defendant points to evidence of Plaintiff's alleged shortcomings in "remembering significant events, following directions, organization, calendaring, preparation, attentiveness, and professionalism." (Def.'s Summ. J. Br., at 17 (Doc. # 17).) Defendant contends, therefore, that, even if it is assumed that Plaintiff is disabled for purposes

of the Rehabilitation Act, Plaintiff is not qualified to perform "the basic tasks required for any [assistant district attorney]" (Def.'s Summ. J. Br., at 17) and, thus, is not a qualified individual within the meaning of § 12111(8).

Although not addressed by the parties, a preliminary issue is whether the prima facie case should include an evaluation of Plaintiff's qualifications.  The Eleventh Circuit has observed that "the qualifications and experience that get a candidate hired for a job and the performance that is satisfactory enough for her to keep it are two different things."  *Alvarez v. Royal Atl. Devs.*, 610 F.3d 1253, 1265 (11th Cir. 2010).  When, as here, the employee's performance "is bound up in the inquiry into whether [his or employer]'s proffered reason . . . was a pretext for discrimination," the court may defer consideration of the employee's performance until the pretext stage of the *McDonnell Douglas* analysis.  *See id.*; *see also Holifield v. Reno*, 115 F.3d 1555, 1562 n.3 (11th Cir. 1997) (deferring consideration of plaintiff's job performance to pretext stage of litigation).  The court will exercise the deferral option here.

### (iii)    *Whether Plaintiff Was Constructively Discharged*

The third element of the prima facie case requires the employee to show that he or she "has suffered an adverse employment action."  *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005).  An adverse employment action is one that a reasonable person would find causes a "serious and material change in the terms,

conditions, or privileges of employment." *Davis v. Town of Lake Park*, 245 F.3d 1232, 1238–39 (11th Cir. 2001).

Defendant does not dispute that had Plaintiff accepted one of the two employment options he offered her in January 2013, she would have suffered a loss in pay, benefits, and responsibilities. (*See* Def.'s Dep., at 125 (confirming that each option was a "demotion")); *see also Crawford v. Carroll*, 529 F.3d 961, 970–71 (11th Cir. 2008) ("An adverse employment action may be an ultimate employment decision, such as 'termination, failure to hire, or *demotion*.'" (emphasis added)).  But, as Defendant points out, she accepted neither option.  Defendant argues that instead, Plaintiff voluntarily resigned because she knew that she no longer fulfilled "the basic requirements of an [Assistant District Attorney]" and that a voluntary resignation is not an adverse employment action.  (Def.'s Summ. J. Br., at 18.)  Plaintiff disagrees, contending that she was forced to resign because the two options presented to her for part-time, non-supervisory employment were degrading and humiliating.

The issue is whether Plaintiff's resignation was voluntary or tantamount to a constructive discharge.  A constructive discharge occurs when working conditions are "so intolerable that a reasonable person in [the employee's] position would have been compelled to resign." *Fitz v. Pugmire Lincoln-Mercury, Inc.*, 348 F.3d 974, 977 (11th Cir. 2003) (citation and internal quotation marks omitted).  The

Eleventh Circuit has observed that "[e]mployees may be constructively discharged by a demeaning demotion or transfer." *Stamey v. S. Bell Tel. & Tel. Co.*, 859 F.2d 855, 860 n.11 (11th Cir. 1988); *see also Pa. State Police v. Suders*, 542 U.S. 129, 134 (2004) ("[A]n employer-sanctioned adverse action," such as a "humiliating demotion," can qualify as a constructive discharge.).

The parties have not addressed the cases discussing constructive discharge as an adverse employment action. Nonetheless, on this record, a reasonable jury could find that a demotion to part-time, non-supervisory prosecutorial work in juvenile court would be demeaning to a supervising assistant district attorney with almost a decade of experience prosecuting felony cases. Not only did each option constitute a loss in pay, benefits, responsibilities, and arguably clout, each option also was temporary, ultimately resulting in Plaintiff's separation from employment. A reasonable jury could conclude that the two employment options merely were a prologue to termination and that the temporary duration of the employment options, from a reasonable employee's perspective, added to the intolerableness of the working conditions.

In sum, the evidence creates a genuine dispute of material fact as to whether Defendant constructively discharged Plaintiff. Accordingly, Plaintiff satisfies the adverse employment action requirement of the *McDonnell Douglas* prima facie case.

**(iv)** *Whether Plaintiff Was Constructively Discharged Solely Because of Her Disability*

Under the Rehabilitation Act, "[i]t is not enough for a plaintiff to demonstrate that an adverse employment action was based partly on his [or her] disability." *Ellis*, 432 F.3d at 1326. A plaintiff also must demonstrate that he or she "suffered an adverse employment action 'solely by reason of' his handicap." *Id.* (quoting § 794(a)).

Defendant contends that Plaintiff "has failed to show that her claimed disability, her voice, was the sole reason for any adverse employment action." (Def.'s Summ. J. Br., at 20.) Defendant's arguments with respect to whether Plaintiff was subjected to an adverse employment action solely because of her disability again merges with Defendant's proffered legitimate, nondiscriminatory reason for Plaintiff's constructive discharge. As grounds for each, Defendant contends that Plaintiff's deteriorating job performance, not her voice, is the reason her employment ended, but that, even if the evidence permits the inference that her voice *and* her deteriorating job performance fueled the constructive discharge, "even one legitimate reason precludes a finding that the Defendant was motivated solely by reason of her disability." (Def.'s Summ. J. Br., at 19.)

The tension resulting from the "dovetail[ing]" of the first two stages of the *McDonnell Douglas* framework has been noted by the Sixth Circuit, which does

36

not engraft a causation requirement (*i.e.*, discriminated against solely because of a disability) into the *McDonnell Douglas* prima facie case in ADA cases: "[W]hether the employee was, in fact, discharged because of the disability – requires at the prima facie stage what the *McDonnell Douglas* burden-shifting framework seeks to uncover only through two additional burden shifts, thereby rendering that framework wholly unnecessary." *Whitfield v. Tennessee,* 639 F.3d 253, 259 (6th Cir. 2011). One district court in the Eleventh Circuit also has weighed in on this issue. *See Brandon v. Lockheed Martin Aeronautical Sys.*, 393 F. Supp. 2d 1341 (N.D. Ga. 2005). The *Brandon* court concluded that the formulation of the *McDonnell Douglas* prima facie case in ADA cases in this circuit "is incorrect because if a plaintiff has proved that he was discriminated against because of his disability, he has actually proved his entire case (and he is entitled to have judgment entered in his favor), not simply made a prima facie showing." *Id.* at 1345. *Brandon* observed nonetheless that, "[d]espite the way that the Eleventh Circuit has articulated this prong of the test, that court has never applied the prong as stated. Instead, the Eleventh Circuit has simply required a plaintiff to present facts from which an inference of discrimination can be made (as is true in all other discrimination cases)." *Id.* at 1346.

It is unnecessary to delve further into the tension noted by the *Whitfield* and *Brandon* courts or to decide the type of proof that would be sufficient in this circuit

to satisfy the causation element of the prima facie case's fourth element.  That is because Plaintiff survives summary judgment no matter at which stage of the *McDonnell Douglas* framework the sole-causation evidence is examined.  For efficiency, the court will examine the evidence one time at the pretext stage.  The analysis proceeds, therefore, to the next stage of the *McDonnell Douglas* framework.

### (b)   *Legitimate, Nondiscriminatory Reasons for the Constructive Discharge*

Defendant contends that it has offered "numerous legitimate, non-discriminatory reasons for the challenged employment actions in this case." (Def.'s Summ. J. Br., at 19.)  In his affidavit submitted in support of summary judgment, Defendant has provided a detailed account of Plaintiff's myriad post-August 2009 job deficiencies that he says culminated in his decision to demote her to part-time, non-supervisory employment.  (*See* Def.'s Aff., at 2–8.)  These reasons focus on Plaintiff's perceived memory loss, violations of office policy, lack of professional judgment in handling cases with case agents and before the grand jury, and ineptness in managing the office.

These reasons are not based upon Plaintiff's speaking disability and are legitimate and nondiscriminatory.   Accordingly, Defendant has satisfied his intermediate burden under *McDonnell Douglas*.

### (c)   *Pretext*

In her summary judgment response, Plaintiff sets out two principal bases for establishing pretext.  First, she relies on the recording of the January 30, 2013 meeting, arguing that the chief deputy specifically said that "her voice" was a real concern with the judges.  (Pl.'s Summ. J. Resp., at 6;  Jan. 30, 2013 meeting (audio recording).)   Second, Plaintiff points to the absence of contemporaneous documentation in her personnel file of job performance problems and the absence of documentation in her medical records of any memory loss.  She contends that "[t]he only documentation of any such [employment] problems is in affidavits created by the Defendant and his witnesses or employees for the purposes of this lawsuit and motion for summary judgment."  (Pl.'s Summ. J. Resp., at 13; *see also* Pl.'s Summ. J. Resp., at 7 (arguing that there is no "contemporary documentation to support Defendant's alleged legitimate nondiscriminatory [reasons]").) Defendant contends that, at the very least, he has articulated at least one reason for constructively discharging Plaintiff that is unrelated to her disability and that, if both permissible and impermissible factors motivated the constructive discharge, Plaintiff cannot demonstrate that the constructive discharge was "solely by reason of" her disability.

It is true, as stated, that Plaintiff's claim cannot survive under the Rehabilitation Act on proof of dual motives for the adverse employment action, *see*

*supra* note 5.   Plaintiff also cannot create a genuine dispute of material fact "by simply quarreling" with the wisdom of Defendant's belief that she no longer performed her job competently.  *Chapman*, 229 F.3d at 1030.   She can create a genuine dispute of material fact as to pretext, though, if she can demonstrate weaknesses or inconsistencies in the legitimate reason "so as to permit a rational jury to conclude that the explanation given was not the real reason," *Rioux*, 520 F.3d at 1279, but that disability discrimination was the sole reason.  Plaintiff meets that burden, albeit barely, based on the following evidence demonstrating weaknesses and inconsistencies in the proffered legitimate reason focused on inferior job performance.

First, "[a] plaintiff may establish pretext by showing that an employer's 'nondiscriminatory reasons were after-the-fact justifications, provided subsequent to the beginning of legal action.'"  *Williams v. Ala. Dep't of Transp.*, 509 F. Supp. 2d 1046, 1056 (M.D. Ala. 2007) (quoting *Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 56 (1st Cir. 2000)).  While Defendant's affidavit compellingly details myriad job performance deficiencies that legitimately would warrant Plaintiff's demotion and ultimate termination, the affidavit, which was submitted as a summary judgment exhibit, is dated July 14, 2014, and, thus, post-dates this litigation.  The timing of the affidavit raises a question as to its motivation because none of the reasons articulated by Defendant in his post-

litigation affidavit were specifically mentioned to Plaintiff in January 2013, as a reason for demoting Plaintiff to a temporary, part-time, non-supervisory position. Additionally, there is evidence pre-dating Plaintiff's constructive discharge that arguably is inconsistent with Defendant's post-litigation affidavit.  Namely, Defendant's affidavit recites a pattern of performance problems beginning not long after Plaintiff's return to work in 2009, and continuing until January 2013, but there also is evidence that, during the midst of Plaintiff's alleged deteriorating job capabilities, Plaintiff received a special merit-based pay raise, which Defendant told Plaintiff was well deserved.  (Mar. 23, 2011 email (Pl.'s Ex. 6).)

Moreover, Defendant has not pointed to any writing created prior to Plaintiff's constructive discharge that documents concerns with Plaintiff's job performance.  (*See, e.g.*, Def.'s Dep., at 126 (admitting that he did not document the "things" he "named" that Plaintiff "allegedly had problems with, including alleged memory issues").)  Although the lack of contemporaneous documentation does not appear to be a procedural irregularity in Defendant's practices and may not be sufficient by itself to establish pretext, it is noteworthy that Defendant's post-litigation affidavit does not find corroboration in the pre-termination written record.  It is the cumulative effect of the foregoing evidence that reveals weaknesses and inconsistencies in the legitimate reasons and creates a jury issue as to whether the reasons Defendant articulated in his affidavit about Plaintiff's

performance problems "are the true reasons for the demotion or merely are 'pretextual post hoc justifications' submitted in defense of this litigation." *Williams*, 509 F. Supp. 2d at 1056 (quoting *Santiago-Ramos*, 217 F.3d at 56).

Second and relatedly, "an employer's failure to articulate clearly and consistently the reason for [the adverse employment action] may serve as evidence of pretext." *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1298 (11th Cir. 2006). It is true that Chief Deputy Robinson, whom Defendant tasked to inform Plaintiff of her employment fate in January 2013, mentioned that there was other "stuff," but he did not articulate the specifics of that "stuff," other than to say that it was more than Plaintiff's personality conflict with the grand jury administrator. As stated, the chief deputy did not inform Plaintiff that her demotion was based upon any of the detailed reasons Defendant subsequently set out in his summary-judgment affidavit, nor did the chief deputy mention Plaintiff's alleged memory loss that is emphasized by Defendant, Ms. Stone, and others. The vagueness of the other "stuff" Chief Deputy Robinson conveyed to Plaintiff at the time of the adverse employment action creates a genuine dispute for trial as to whether the other "stuff" encompasses a true reason for Plaintiff's constructive discharge.

Third, there is evidence that Plaintiff's voice was a consideration in her constructive discharge. During the January 2013 meeting, Chief Deputy Robinson

devoted substantial discussion to Plaintiff's voice.  The chief deputy emphasized the dashed hopes that her voice would "get better" and the judges' "concerns" about her voice, and emphasized that her voice was an impediment to her courtroom responsibilities.  While Defendant says in his affidavit and confirms in his deposition that he "would never have allowed for [Plaintiff] to be terminated simply because of her vocal issues" (Def.'s Aff., at 6; Def.'s Dep., at 126–27), he does not address the arguable link between the chief deputy's statements to Plaintiff that "[i]t's just not working out" and that the judges have "concerns about your voice."  (Jan. 30, 2013 meeting (audio recording).)  The statements made by Defendant's chief deputy to Plaintiff during the January 2013 meeting about her voice cannot be ignored; they conflict with Defendant's attempt to disclaim reliance on Plaintiff's disability and raise a genuine dispute as to whether Plaintiff's disability is the sole reason that prompted Defendant's decision to adversely affect her employment.

The summary judgment record in its totality raises a genuine dispute of material fact as to whether Defendant's nondiscriminatory reasons for constructively discharging Plaintiff are false and whether disability discrimination is the real and sole reason for Defendant's decision. *See Brooks*, 446 F.3d at 1163; § 794(a).  At the same time, Plaintiff faces a challenging trial burden in light of the Rehabilitation Act's sole-causation standard and the depth of the evidence from

multiple individuals recounting Plaintiff's deteriorating job performance.  For now, Plaintiff has submitted evidence that precludes summary judgment on her disability discrimination claim alleging a constructive discharge.  Accordingly, Defendant's motion for summary judgment on this claim is due to be denied.

## B.    <u>Retaliation Under the Rehabilitation Act</u>

The Rehabilitation Act "incorporates the anti-retaliation provision from § 12203(a) of the ADA." *Morales v. Ga. Dep't of Human Res.*, *Div. of Family & Children*, 446 F. App'x 179, 183 (11th Cir. 2011); *see also* §§ 791(g), 793(d), 794(d).[11]  The ADA's anti-retaliation provision provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter."   42 U.S.C. § 12203(a).   In turn, "[r]etaliation claims under the ADA are analyzed under the framework of Title VII." *Morales*, 446 F. App'x at 183.   Accordingly, as the Eleventh Circuit has observed, "We assess retaliation claims pursuant to the Rehabilitation Act under the framework we use in assessing Title VII retaliation claims." *Burgos-Stefanelli v. Sec'y, U.S. Dep't of Homeland Sec.*, 410 F. App'x 243, 245 (11th Cir. 2011).

---

[11] Section 794(d) provides:

The standards used to determine whether this section has been violated in a complaint alleging employment discrimination under this section shall be the standards applied under title I of the Americans with Disabilities Act of 1990 (42 U.S.C. 12111 *et seq*.) and the provisions of sections 501 through 504, and 510, of the Americans with Disabilities Act of 1990 (42 U.S.C. 12201 to 12204 and 12210), as such sections relate to employment.

Because the evidence submitted is circumstantial, Plaintiff's retaliation claims also are governed by the *McDonnell Douglas* tripartite burden-shifting framework. Under the first part, a plaintiff makes a prima facie case of retaliation by showing that "(1) she engaged in an activity protected under [the Rehabilitation Act]," (2) "she suffered an adverse employment action," and (3) "there was a causal connection between the protected activity and the adverse employment action." *Crawford*, 529 F.3d at 970. Defendant contends that Plaintiff cannot demonstrate elements (1) and (2) of the prima facie case.

### 1.    *Protected Activity*

Defendant contends that Plaintiff has failed to demonstrate "a single protected activity or expression that she engaged in to serve as the basis for any possible retaliation claim." (Def.'s Summ. J. Reply, at 13 (Doc. # 25); *see also* Def.'s Summ. J. Br., at 22–23 (contending that "Plaintiff cannot recall any specific complaints that she made").) Plaintiff responds that she engaged in protected activities by (1) "complaining about disability discrimination" and by (2) "opposing the harassment [ ] by supervisors about her health." (Pl.'s Summ. J. Resp., at 15.) The evidence upon which Plaintiff relies does not support her broad contentions.

Plaintiff provides a string citation to her deposition testimony (three pages of it) and the two audio recordings from the May 2012 and January 2013 meetings,

but without any analysis.  She points to nothing in those evidentiary sources that shows that she complained about or opposed discrimination or harassment.  The deposition transcript pages upon which she relies focus on the January 2013 meeting and the humiliation she endured when Defendant did not give her the "common courtesy" to confront her directly with the two alternative employment options for nonsupervisory, part-time employment for a limited duration.  (Pl.'s Dep., at 57–59.)  There is no testimony contained in those three pages where Plaintiff said, "'Stop it.'"  (Pl.'s Summ. J. Resp., at 15 (stating that "an employee's exclamation 'Stop it' or 'I oppose it' when made about discriminatory conduct is sufficient to invoke the protections of the 'Opposition' clause," but citing no examples in the record where she made similar statements).)  In fact, during her deposition, Plaintiff was unable to articulate any protected activities in which she engaged during her employment.  When asked, she merely responded that she was a "criminal lawyer," not a lawyer with expertise in employment law.  (Pl.'s Dep., at 114.)

Moreover, Plaintiff does not give one example of when or how she complained or opposed unlawful discrimination or harassment during the May 2012 or January 2013 meetings.  Instead, in her brief in the "facts" section, Plaintiff recites only what was said to her during these meetings.  She does not indicate what she said during those meetings that she now contends qualifies as

protected activity on her part, and it is beyond the proper role of the court on summary judgment to guess what Plaintiff is attempting to argue qualifies as protected activity. *See Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("[T]he onus is upon the parties to formulate arguments [on summary judgment].").  Accordingly, the retaliation claims fail because Plaintiff has not  raised a genuine dispute of material fact that she engaged in any protected activity.

### 2.   *Adverse Employment Action*

Defendant also contends that Plaintiff cannot show an adverse employment action to support her retaliation claims.  To demonstrate an adverse employment action, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse," meaning that the action "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (defining adverse employment action under Title VII's anti-retaliation provision).

The Complaint's retaliation count (Count II) alleges the following adverse employment actions:  Defendant (1) "refused to permit [Plaintiff] to take FMLA leave" [Family and Medical Leave Act]; (2) "directed [Plaintiff] to continue working when he needed to exercise her right to an accommodation"; (3) "denied

[Plaintiff's] accommodation consisting of provision of a microphone; (4) "disciplined [Plaintiff] for using medical leave"; (5) "threatened and intimidated [Plaintiff] for using medical leave and for requiring an accommodation"; and (6) "ended [Plaintiff's] employment by forcing her to resign." (Compl. ¶ 69; *see also* Pl.'s Summ. J. Resp., at 15.) Each action in (1) through (6) is treated as supporting a separate retaliation claim and is referred to as a "claim" below.

Plaintiff cannot survive summary judgment by resting on the allegations of her Complaint, but instead she must set forth evidence that shows a genuine dispute of material fact. *See Celotex*, 477 U.S. at 324. She has failed to set forth such evidence with respect to claims (1), (2), (3), (4), and (5) and, thus, for this additional reason, those retaliation claims fail.[12]

### (a)   *Claim (1)*

Claim (1) fails because Plaintiff has not pointed to any evidence to substantiate the allegation that she was subjected to an adverse employment action. In the Order on Pretrial Hearing, Plaintiff stipulates that she "was provided with all the leave she requested and was never denied leave." (Order on Pretrial H'rg, at 4.) She similarly admitted during her deposition that Defendant never refused any of her requests for leave (Pl.'s Dep., at 34), and, additionally, the record shows

---

[12] It is presumed that a constructive discharge qualifies as an adverse employment action under the retaliation framework, but Plaintiff points to no protected activity that was the impetus for the constructive discharge.

that Defendant liberally gave Plaintiff leave and benefits to accommodate her medical appointments and surgeries.   Plaintiff's allegations that Defendant disallowed her to take FMLA leave are directly refuted by the evidence and her stipulation.   Plaintiff is left with an unsupported allegation and an argument in a brief.   *See United States v. Cardona*, 302 F.3d 494, 497 (5th Cir. 2002) ("[A]rguments in brief are not evidence.").   Because Plaintiff has not raised a genuine dispute of material fact that she was subjected to an adverse employment action, claim (1) fails.

(b)   <em>Claims (2) and (3)</em>

Claims (2) and (3) are problematic because Plaintiff has not pointed to any evidence raising a genuine dispute of material fact that Defendant denied her requested accommodation.   To the contrary, Plaintiff concedes that Defendant provided her the only accommodation she requested:   an amplification system in the courtroom.   (*See* Pl.'s Dep., at 39–40 (answering in the affirmative when asked, "So the accommodation you needed, which was a microphone and an amplification system, he provided; is that correct?"); *see also* Pl.'s Dep., at 36–37, 45, 53.) Without evidence to substantiate these alleged adverse employment actions, summary judgment is due to be entered in Defendant's favor on claims (2) and (3).

### (c)   *Claim (4)*

The adverse employment action underlying claim (4) is that Defendant disciplined Plaintiff for using medical leave.  In her summary judgment response, Plaintiff does not explain or give an example of how she contends she was disciplined, nor does she provide any citation to evidence of any disciplinary measures imposed against her for using medical leave.  Her deposition testimony reveals the contrary. When asked about "discipline," Plaintiff admitted that she "never lost pay," never lost benefits," "never was asked to take leave without pay," and was "never denied leave."  (Pl.'s Dep., at 111.)  Plaintiff fails, therefore, to raise a genuine dispute of material fact that she was disciplined for using medical leave.

### (d)   *Claim (5)*

As grounds for claim (5), Plaintiff alleges that she was "threatened and intimidated . . . for using medical leave and for requiring an accommodation."  The adverse employment actions underlying claim (5), therefore, are threats and intimidation.  Plaintiff's summary judgment response again is bereft of any citation to the record of evidence that she contends amounts to threats and intimidation. Without providing the nature of the threats and intimidation, Plaintiff fails to present a factual foundation for evaluating whether the threats and intimidation

would dissuade a reasonable employee from engaging in protected activity.[13]  *See*

*Burlington*, 548 U.S. at 68.  Plaintiff fails to demonstrate an adverse employment

action to support claim (5).

## C.   Hostile Work Environment (Disability-Based and Retaliatory-Based)

Defendant argues that Plaintiff cannot make out a prima facie case of a

disability-based or retaliatory-based hostile work environment claim.   In an

unpublished opinion, the Eleventh Circuit has analyzed a hostile work environment

claim under the Rehabilitation Act, borrowing the elements from the Title VII

---

[13] Defendant's summary judgment brief points out that Plaintiff testified at her deposition that, although Defendant always granted her leave requests, he used a "tone" when she asked for medical leave.  (Def.'s Summ. J. Br., at 8 (citing Pl.'s Dep., at 108 (mentioning Defendant's "tone" when asked how she had been "threatened and intimidated and discouraged from using medical leave")).)  Plaintiff does not rely on this evidence in her summary judgment response. She also does not cite any authority that Defendant's "tone" would be sufficient to demonstrate an adverse employment action.  The argument is deemed abandoned and, alternatively, lacks support in case law.

Plaintiff also contends that Defendant threatened and intimidated her for *requiring* an accommodation.  The court is cognizant that, in this circuit, an employee engages in statutorily protected activity in requesting an ADA accommodation if he or she "had a good faith, objectively reasonable belief that he [or she] was entitled to those accommodations under the ADA."  *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1328 (11th Cir. 1998); *see also Kelley v. Corr. Med. Servs., Inc.*, 707 F.3d 108, 115 (1st Cir. 2013) ("Requesting an accommodation is protected conduct under the ADA's retaliation provision.").  Even if Plaintiff had argued that her *request* for a microphone in the courtrooms was protected activity, Plaintiff points to no factual basis, as discussed, that any threats or intimidation followed this request, which Defendant undisputedly granted.  As to the constructive charge, the sole adverse employment action that finds factual support in the record, it occurred on January 30, 2013, almost a year after Plaintiff requested a microphone in the courtrooms upon her reassignment to Chilton County in February 2012.  Plaintiff does not attempt to link her request for a microphone to her constructive discharge and appropriately so.  Under Eleventh Circuit case law, "[e]ven a three-month interval between the protected expression and the employment action . . . is too long" to establish causation for purposes of the prima facie case.  *Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1182 (11th Cir. 2010); *see also Higdon v. Jackson*, 393 F.3d 1211, 1221 (11th Cir. 2004) (holding that, by itself, three months was insufficient to prove causation on a retaliation claim).

playbook. *Burgos*, 274 F. App'x at 842. The court will do the same. A plaintiff makes out a prima facie case of hostile work environment by showing

> (1) that she belongs to a protected group; (2) that she was subjected to unwelcome harassment or retaliation; (3) that the harassment or retaliation was based upon a protected characteristic . . . ; (4) that the harassment or retaliation was sufficiently severe or pervasive to alter the terms and conditions of her employment; and (5) there is a basis for holding her employer liable.

*Manley v. Dekalb Cnty. Ga.*, ___ F. App'x ___, 2014 WL 4346815 (11th Cir. 2014) (citing *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002)); *see also Gowski v. Peake*, 682 F.3d 1299, 1312 (11th Cir. 2012) (holding as a matter of first impression that "this circuit recognizes a cause of action for retaliatory hostile work environment" under Title VII).

### 1.   *Disability-Based Hostile Work Environment*

Defendant contends that there is no evidence that he or any of his employees were "mean or hostile" to Plaintiff on the basis of her disability (Def.'s Summ. J. Br., at 17), and that, when asked at her deposition, Plaintiff could not provide any examples of incidents establishing that she was subjected to a hostile work environment on the basis of her disability (Def.'s Summ. J. Reply, at 2, 12). Defendant's arguments hammer directly on the fourth element.

In her summary judgment response, Plaintiff does not address the elements of a hostile-work-environment claim based upon a disability or "formulate arguments" about this claim, which she is required to do on summary judgment.

*Resolution Trust Corp.*, 43 F.3d at 599.  Rather, she says in cursory fashion that there are audio "recordings of the harassment by supervisors regarding her health." (Pl.'s Summ. J. Resp., at 13; *see also* Pl.'s Summ. J. Resp., at 3 (facts section) (referring generically to the audio recordings of the May 2012 and January 2013 meetings as revealing the "threaten[ing]" and demeaning workplace to which she was subjected).)  Elsewhere in her brief, Plaintiff describes the May 2012 meeting as a "46[-]minute verbal harassment and rant . . . almost entirely about her health." (Pl.'s Summ. J. Resp., at 5–6.)  This evidence fails to raise a genuine dispute of material fact as to the severe-or-pervasive element's objective component.

Under the fourth element of the prima facie case, the plaintiff's workplace must have been "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal quotation marks and citation omitted); *Gowski v. Peake*, 682 F.3d 1299, 1311 (11th Cir. 2012) (same).  The objective component of the fourth element takes into consideration the allegedly discriminatory or retaliatory conduct's "frequency; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."[14]  *Reeves v. C.H.*

---

[14] There also is a subjective component, which in light of the court's findings need not be addressed.  *See Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999) (The victimized

*Robinson Worldwide, Inc.*, 594 F.3d 798, 809 (11th Cir. 2010) (en banc) (quotation marks and ellipses omitted).  The objective severity or pervasiveness "should be judged from the perspective of a reasonable person in the plaintiff's position."  *Id.*

A review of the audio recordings and the entire summary-judgment record points to the conclusion that, from an objective standpoint, no reasonable jury could find that Plaintiff's office environment was saturated with discriminatory conduct that was sufficiently severe or pervasive as to alter the conditions of Plaintiff's employment and create a hostile working environment.  Plaintiff points to no evidence that Defendant ridiculed or insulted her based upon her disability or that he or his employees physically threatened Plaintiff.  Plaintiff focuses on Ms. Stone's comments during the May 2012 meeting and the treatment she endured during the January 2013 meeting.  While some of the comments made in the May 2012 and January 2013 meetings plainly were based upon Plaintiff's disability and perhaps were directed toward Plaintiff through "screaming" (Pl.'s Dep., at 101), the comments made during these two meetings held eight months apart and over the course of Plaintiff's nearly four-year employment after her August 2009 hospitalization do not rise to the level of severe or pervasive as a matter of law.

---

employee "must subjectively perceive the harassment as sufficiently severe [or] pervasive to alter the terms or conditions of employment, and this subjective perception must be objectively reasonable." (citation and internal quotation marks omitted)).

### 2.      *Retaliatory Hostile Work Environment*

For at least three reasons, Plaintiff's retaliatory hostile work environment claim fails.  First, a retaliatory hostile work environment claim requires evidence that the employer subjected the employee to a hostile work environment in retaliation for *the employee's protected activity*.[15]  *See Gowski*, 682 F.3d at 1312. In Part IV.B.2., the court found that Plaintiff has not shown that she engaged in any activity protected by the Rehabilitation Act; therefore, her retaliatory hostile work environment claim also must fail.  Second, Plaintiff points to no evidence of any actions that "were sufficiently severe or pervasive to alter the terms and conditions of employment," as discussed above, which is an additional reason why her retaliatory hostile work environment claim cannot survive summary judgment. Third, the totality of Plaintiff's argument is that she suffered "a hostile work environment as a result of her having complained of disability discrimination." (Pl.'s Summ. J. Resp., at 1.)  Such a cursory argument cannot support a claim.

### 3.      *Summary*

It is Plaintiff's burden to demonstrate a prima facie case, *see Freeman v. City of Riverdale*, 330 F. App'x 863, 865 (11th Cir. 2009), and Defendant properly has employed the summary judgment procedure to show that Plaintiff "cannot produce admissible evidence to support" claims for a retaliatory and disability-

---

[15] For purposes of this opinion, it is assumed, without deciding, that a retaliatory hostile work environment claim is cognizable under the Rehabilitation Act.

based hostile work environment, Fed. R. Civ. P. 56(c)(1)(B).    Accordingly, Plaintiff's hostile work environment claims cannot survive summary judgment under the Rehabilitation Act, and Defendant's motion for summary judgment will be granted on these claims.

## V.  CONCLUSION

For the foregoing reasons, it is ORDERED that Defendant's motion for summary judgment (Doc. # 16) is GRANTED in part and DENIED in part as follows:

(1)    GRANTED on Plaintiff's disability discrimination claim alleging the denial of a reasonable accommodation;

(2)    DENIED on Plaintiff's disability discrimination claim alleging constructive discharge;

(3)    GRANTED on Plaintiff's retaliation claims; and

(4)    GRANTED on Plaintiff's hostile work environment claims (disability-based and retaliatory-based).

DONE this 3rd day of November, 2014.

_____
           /s/ W. Keith Watkins
CHIEF UNITED STATES DISTRICT JUDGE